UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THE ELECTRONIC RECYCLING ASSOCIATION OF ALBERTA,<br><br>Plaintiff,<br><br>v.<br><br>BASEL ACTION NETWORK,<br><br>Defendant. | CASE NO. C18-1601-MJP<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS |

THIS MATTER comes before the Court on Defendants' Motion to Dismiss the First Amended Complaint. (Dkt. No. 8.) Having reviewed the Motion, the Response (Dkt. No. 20), the Reply (Dkt. No. 21), the Supplemental Briefing (Dkt. No. 13), and the related record, the Court GRANTS IN PART and DENIES IN PART.

**Background**

Plaintiff Electronic Recycling Association of Alberta ("ERA") is a Canadian non-profit corporation that specializes in recovering, refurbishing, and reusing discarded electronic equipment or "e-waste." (Dkt. No. 9 ("FAC") at ¶ 9.) According to the FAC, ERA collects

unwanted electronic equipment from businesses and individuals; removes any remaining electronic data; and then donates refurbished equipment to non-profits, and care and educational facilities. (Id. at ¶¶ 11-16.) To cover its operational costs, ERA also sells working computer systems. (Id. at ¶ 13.) ERA does not dismantle or recycle electronic components and is not an e-waste recycler. (Id. at ¶ 18.) Instead, when it determines that equipment is no longer reusable, it transfers that equipment to "regulated and approved facilities to be recycled." (Id.) According to the FAC, it is these approved recyclers, not ERA, which then ship dismantled components to further destinations. (Id.)

Defendant Basel Action Network ("BAN") is a non-profit environmental advocacy organization based in Seattle, Washington. (Id. at ¶ 2.) BAN investigates and reports on e-waste, including whether its exportation violates the Basel Convention.[1] (Id. at ¶¶ 22-23.) In October 2018, BAN published a report titled "Export of e-Waste from Canada: A Story as Told by GPS Trackers" (hereinafter, the "Report") along with a press release titled "GPS Trackers Reveal More Canadian e-Waste Exported to Developing Countries" (hereinafter, the "Press Release"). (Id. at ¶ 37; Dkt. No. 9, Exs. A, B.) The Report details BAN's efforts to determine "whether Canada and its electronics industry was complying with the waste trade obligations of the Basel Convention and the laws of Canada and of importing countries." (Dkt. No. 9, Ex. A.) It explains that BAN affixed GPS trackers to 43 "non-functional and economically unrepairable" electronic devices, which it then delivered to "various electronics recyclers or recycler collection sites" in Canada, including ERA. (Id. at 8.) The Report indicates that ERA (1) shipped three of

---

[1] The Basel Convention on the Transboundary Movements of Hazardous Wastes and Their Disposal is an "international treaty designed to reduce the movements of hazardous waste between nations and, specifically, to prevent transfer of hazardous waste from developed to less-developed countries." (See Dkt. No. 13 at 5.)

the tracked devices to China and Pakistan, "showing substantial evidence of likely illegal exportation"; (2) is a "repeat offender" with "a history of making similar exports in the past"; and (3) failed to remove "sensitive and private residual corporate data" from computers that it allegedly refurbished and re-sold to BAN. (Id. at 30-36, 43-49.) In addition, the Report indicates that ERA's founder, Mr. Bojan Paduh "threatened BAN volunteers photographing his property and later sent people to confront and intimidate the volunteers with large dogs." (Id. at 49.) The Press Release similarly indicates that ERA was "in likely violation of the Basel Convention." (Dkt. No. 9, Ex. B at 2.)

According to the FAC, both the Report and the Press Release contain false and defamatory statements which are "demonstrably false and fundamentally misrepresent the actual facts and ERA's function and business." (Dkt. No. 9 at ¶ 47.) In particular, ERA contends that: (1) it has "no record of ever selling BAN any electronic devices and has no record of receiving any GPS-tracked devices from BAN or anyone else"; (2) it has "extensive policies and procedures to ensure [residual corporate data] is not retained on items that are reused or result"; (2) it did not export any of the shipping containers identified in BAN's Report' and (4) "Mr. Paduh did not threaten BAN volunteers photographing his property and did not send anyone to 'confront and intimidate the volunteers with large dogs.'" (Id. at ¶¶ 47-48.)

ERA alleges that, as a result of the allegedly false statements in the Report and Press Release, it has been "inundated with calls and emails from customers, prospective customers, and industry-acquaintances about the false and misleading statements," and has lost business. (Id. at ¶¶ 50-51.)

**Discussion**

I. **Legal Standard**

The Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A complaint may fail to show a right of relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." Woods v. U.S. Bank N.A., 831 F.3d 1159, 1162 (9th Cir. 2016). In ruling on a Rule 12(b)(6) motion, the Court must accept all material allegations as true and construe the complaint in the light most favorable to the non-movant. Wyler Summit P'Ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (1955)).

Despite this otherwise liberal pleading standard, the Ninth Circuit has held that courts should consider First Amendment concerns even at the pleading stage. "[W]here a plaintiff seeks damages . . . for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than are otherwise required." Flowers v. Carville, 310 F.3d 1118, 1130 (9th Cir. 2002). "Defamation claims, in particular, require a heightened level of specificity," Harris v. City of Seattle, 315 F. Supp. 2d 1112, 1123 (W.D. Wash. 2004), including "the precise statements alleged to be defamatory, who made them and when." Flowers, 310 F.3d at 1130; see also Paterson v. Little, Brown & Co., 502 F. Supp. 2d 1124, 1132 (W.D. Wash. 2007) (explaining that a complaint "must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists.").

## II. Defamation

The elements of a defamation claim are (1) a false statement; (2) lack of privilege; (3) fault; and (4) damages. Herron v. KING Broadcasting Co., 112 Wn.2d 762, 776 (1989). Here, BAN contends that ERA has failed to state a claim for defamation because: (1) the FAC does not set forth specific, material facts establishing falsity, including "how and why the statements are false and defamatory" and "factual support to show that those statements are false" and (2) many of the allegedly defamatory statements in the Report are "vague, subjective, and based on lay person opinion." (Dkt. Nos. 13, 21.)

The Court addresses each of these contentions in turn:

### A. Falsity

While it is not sufficient to plead falsity in vague, conclusory terms, BAN cites no case—and the Court is aware of none—indicating that a plaintiff must plead specific facts *proving* the falsity of the statements in dispute. To the contrary, "[t]he falsity element of a defamation claim requires the plaintiff to allege facts *giving rise to a reasonable inference* that 'the offensive statement was provably false.'" Delashaw v. Seattle Times Co., Case No. 18-0537JLR, 2018 WL 4027078, at *11 (W.D. Wash. Aug. 23, 2018) (quoting Valdez-Zontek v. Eastmont Sch. Dist., 154 Wn. App. 147 (2010)) (emphasis added). Proving falsity "typically requires discovery" and is not resolved at the pleading stage. See, e.g., Karedes v. Ackerly Grp., Inc., 423 F.3d 107, 113 (2d Cir. 2005) (citation omitted); Burton v. Label, LLC, 344 F. Supp. 3d 680, 699-700 (S.D.N.Y. 2018) ("Whether the statements are in fact false remains to be seen, and must await discovery.").

Construing all inferences in ERA's favor, as it is required to do under Rule 12(b)(6), the Court finds that the FAC plausibly pleads falsity. This is not a case where the plaintiff merely alleged that the disputed statements were "false" without further elaboration or failed to allege

falsity altogether. Cf. Pan Am Sys., Inc. v. Hardenbergh, 871 F. Supp. 2d 6, 16 (D. Me. 2012); Block v. WSBA, Case No. 15-2018RSM, 2016 WL 7734884, at *3 (W.D. Wash. Apr. 19, 2016). Instead, the FAC lays out specific reasons that certain statements in the Report and Press Release are false. For example, the FAC pleads that ERA (1) "does not ship hazardous e-waste material within or outside of Canada"; (2) has "no record of ever selling BAN any electronic devices and has no record of receiving any GPS-tracked devices from BAN or anyone else"; (3) has "extensive policies and procedures to ensure [residual corporate data] is not retained on items that are reused or result"; (4) "neither owns the shipping containers pictured nor exported any of the containers identified in the Report"; and (5) that "Mr. Paduh did not threaten BAN volunteers photographing his property and did not send anyone to 'confront and intimidate the volunteers with large dogs.'" (FAC at ¶¶ 47-48.) While BAN's contention that these allegations do not refute, and perhaps "artfully avoid an actual denial" of the statements in the Report and Press Release (Dkt. No. 21 at 10) is well-taken, it is not for the Court to determine, at this stage, whether the statements are *in fact* false. Instead, it is enough that the FAC provides sufficient facts giving rise to a plausible inference of falsity.

**B. Opinion**

Defamatory statements are not actionable unless they are capable of being proved true or false. See, e.g., Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990). Accordingly, the Court must determine whether certain of the allegedly defamatory statements were intended as a statement of fact or an expression of opinion. See Camer v. Seattle Post-Intelligencer, 45 Wn. App. 29, 39 (1989) ("The determination of whether a communication is one of fact or opinion is a question of law for the court."). In making this determination, the Court considers the "totality of the circumstances" surrounding the statements, including "the medium and context, the

audience, and whether the statement implies 'undisclosed facts.'" Paterson v. Little, Brown & Co., 502 F. Supp. 2d 1124, 1134 (W.D. Wash. 2007) (citing Robel v. Roundup Corp., 148 Wn.2d 35, 55-56 (2002)).

BAN contends that statements offering an opinion as to the legality or implications of ERA's conduct are non-actionable, as are statements concerning whether Mr. Paduh threatened or intimidated BAN volunteers. (Dkt. Nos. 8, 21.)

The Court addresses each of these contentions in turn:

**(1) Legality of BAN's Conduct**

In a section of the Report titled "Exported Trackers in Detail," BAN speculates as to the legality of each export based upon the GPS trackers' last reported coordinates and Canada's obligations to the importing country under the Basel Convention. (Dkt. No. 9, Ex. A at 30-42.) Here, it states that three of the trackers delivered to ERA were affixed to exports that were "likely illegal." (Id. at 30, 32, 35.)

The Court finds that these statements are opinion. First, the statements appear in a report undertaken by an environmental advocacy organization in an effort to investigate compliance and encourage the e-waste industry and government to "rectify the illegal and unsustainable exports from Canadian shores to developing countries." (Id. at 9.) To the extent that they were made "[i]n the context of [an] ongoing public debate," readers are likely prepared for "mischaracterizations and exaggerations" and are "likely to view such representations with an awareness of the subjective biases of the speaker." Dunlap v. Wayne, 105 Wn.2d 529, 539 (1986) (en banc); see also Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir. 1999) ("Absent a clear and unambiguous ruling from a court or agency of

competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact.").

Second, the statements qualify the exports as "likely" illegal. Use of such "cautionary 'terms of apparency'" similarly indicates that they are less likely to be understood as statements of fact. Coastal Abstract Serv., 173 F.3d at 731; see also Information Control Corp. v. Genesis One Comp. Corp., 611 F.2d 781, 784 (9th Cir. 1980).

Finally, the statements are based entirely upon "disclosed or assumed nondefamatory facts" (i.e., the data set forth in the Report) and do not "impl[y] that there are undisclosed facts on which the opinion is based." Dunlap, 105 Wn. 2d at 848-49. "Arguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statement themselves." Id. For this reason, "deductive opinions are not necessarily in the same category of actionability as . . . communications that convey false and defamatory information about the plaintiff. . . ." Id.

### (2) Mr. Paduh's Conduct

In a section of the Report titled "ERA: Canada's Prolific Exporter," BAN details ERA's "threats and donations" as follows:

> We exposed the above information previously to the Vancouver Sun in 2013. The founder of ERA, Mr. Bojan Paduh, rather than explaining why he exports, how much and whether it can be done legally, threatened the Sun with lawsuits and likewise wrote BAN an angry, threatening letter (see below).
>
> Prior to receiving this letter, Mr. Bojan Paduh had threatened BAN volunteers photographing his property and later sent people to confront and intimidate the volunteers with large dogs. . . .

(Dkt. No. 9, Ex. A at 49.)

BAN contends that "whether the volunteers felt threatened or intimidated and the size of Mr. Paduh's dog are matters of opinion, not susceptible to verification." (Dkt. No. 13.) While

the contested statements *contain* subjective evaluations (i.e., the size of the dogs), on the whole, "a reasonable factfinder could conclude that the [the statements] impl[y] an assertion of objective fact." Unelko Corp. v. Rooney, 912 F.2d 1049, 1053 (9th Cir. 1990). Whether the volunteers photographed Mr. Paduh or ERA's property, whether they encountered Mr. Paduh and his dogs, and what impact the encounter had on them are all facts capable of verification.

The Court GRANTS the Motion to Dismiss with respect to the claims concerning the legality of ERA's conduct and DENIES with respect to the claims concerning Mr. Paduh's conduct.

**I.  Tortious Interference**

The elements of a claim for tortious interference with a business expectancy include (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) damages. Allstate Ins. Co. v. Tacoma Therapy, Inc., Case No. 13-05214RBL, 2014 WL 1494100, at *5 (W.D. Wash. Apr. 16, 2014) (citing Topline Equipment, Inc. v. Stan Witty Land, Inc., 31 Wn. App. 86, 92 (1982)).

A tortious interference claim brought as a result of constitutionally protected speech is subject to the same requirements that govern actions for defamation. Unelko Corp., 912 F.2d at 1058; see also Lawson v. Boeing Co., 58 Wn. App. 261, 269 (1990) ("Statements privileged under the law of defamation are also privileged under the law of interference with prospective economic advantage.") (citation omitted). Here, in addition to the facts pled in support of its defamation claim, ERA has pled specific facts in support of its tortious interference claim and

has even alleged that a specific customer (GreenTec) ended its relationship with ERA based upon BAN's Report and Press Release. (FAC at ¶¶ 49-51.)

The Court DENIES the Motion to Dismiss the tortious interference claim.

**III.     False Advertising**

To establish a claim for false advertising under the Lanham Act, ERA must plead facts showing that "in advertisements, defendant made false statements of fact about its own or another's product." Rice v. Fox Broad. Co., 330 F.3d 1170, 1180 (9th Cir. 2003). For a statement to be actionable, it must be (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services." Id. at 1181 (citation omitted). In addition, the statement "must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." Id. (citation omitted); see also CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n, 2016 WL 5118530, at *5 (S.D. Cal. Sept. 21, 2016) (citation omitted).

The FAC alleges that, in addition to setting forth the results of its e-waste investigation, the Report advertises commercial services offered by BAN including (1) its "e-Stewards" certification program and (2) its "EarthEye" GPS tracking technology. (FAC at ¶¶ 25-34.) The FAC describes these services as follows:

> BAN markets its e-Stewards certification as giving companies in the e-waste industry a competitive advantage over non-certified companies. For an undisclosed amount of money, companies can pay BAN fees to take part in what BAN describes as an accredited, third-party audited certification program for companies engaged in recycling, repair, upgrading, and refurbishment of electronics.
>
> Upon successful completion of the program, companies can sign a license agreement with BAN and display an e-Stewards logo on their website. The fee for the license is based on a percentage of the certified company's revenues. The more revenue a company makes, the higher the payment to BAN for use of the e-Stewards license. Thus, it is in BAN's economic interest to direct and encourage consumers and customers to use e-Stewards certified companies and to direct

consumers and customers away from doing business with companies who are not e-Stewards certified.

. . .

The EarthEye website touts that the EarthEye™ technology is fully integrated into BAN's e-Stewards certification program. BAN will not offer EarthEye service to a company within the e-waste industry unless the company is e-Stewards certified.

(FAC at ¶¶ 28-29, 32.)

According to ERA, the Report "repeatedly touts" the e-Stewards and EarthEye services and encourages readers to avoid doing business with companies—including ERA—that are "not certified." (Id. at ¶ 71.) As a result, ERA has suffered loss to reputation, loss to sales, and loss of business relationships. (Id. at ¶ 76.)

BAN contends that ERA's Lanham Act claim fails as a matter of law because (1) the Report and Press Release do not constitute commercial speech and (2) ERA and BAN are not competitors.

The Court addresses each of these contentions in turn:

**A. Commercial Speech**

In determining whether a "mixed-content" publication (i.e., a publication which contains both commercial and noncommercial speech and does "more than propose a commercial transaction") constitutes "commercial speech" for purposes of the Lanham Act, the Court applies a two-step analysis. First, the Court considers whether (1) the speech is an advertisement; (2) the speech refers to a particular product; or (3) the speaker has an economic motivation. See Coastal Abstract Serv., supra, 173 F.3d at 735 (citations omitted); see also Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 958 (9th Cir. 2012) (citations omitted). These factors were identified by the Supreme Court in Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-68 (1983) and are known as the "Bolger factors." Second, even if a mixed-content publication meets this

threshold, the Court considers whether "the commercial aspects of the speech are 'inextricably intertwined' with otherwise fully protected speech." Dex Media, 696 F.3d at 958 (citing Riley v. Nat'l. Fed'n. of the Blind of N.C., 487 U.S. 781, 796 (1988)). These determinations are to be made based upon "the nature of the speech taken as a whole." Riley, 487 U.S. at 796.

While all factors need not be present for speech to be commercial, no one factor is itself dispositive. See Bolger, 463 U.S. at 67; Dex Media, 696 F.3d at 958. Ultimately, "[a]ny consideration of whether speech is commercial should rest on the commonsense distinction between speech proposing a commercial transaction . . . and other varieties of speech." Bolger, 463 U.S. at 64 (internal quotation marks and citations omitted).

Evaluation of the Bolger factors leads to the conclusion that the Report does not constitute commercial speech: The first factor weighs against a finding of commercial speech, as the Report is qualitatively different from a typical advertisement. The Report was undertaken to investigate "whether Canada and its electronics industry was complying with the waste trade obligations of the Basel Convention and the laws of Canada and of importing countries" (Dkt. No. 9, Ex. A at 8) and "[t]here is no evidence that the editorial content is added as a mere sham to convert a pure advertising leaflet into noncommercial speech." Dex Media, 696 F.3d at 959. Indeed, the Report's references to e-Stewards and EarthEye are minimal—Out of the approximately 13,000 words in the Report, "e-Stewards" appears five times and "EarthEye" appears twice. (See Dkt. No. 9, Ex. A.)

The second factor also weighs against a finding of commercial speech. While there is no dispute that the Report references e-Stewards, it does so in comparison to other recycling standards. (See, e.g., Dkt. No. 9, Ex. A at 48 (explaining that ERA does not "operate under any certified environmental management systems such as ISO14001, nor do they possess recycling

or data security certifications (e.g., e-Stewards, R2, NAID) – that are expected of responsible electronics recyclers."); Id. at 50 (explaining that out of "the four global electronics recycling standards" (R2, e-Stewards, WEEELABEX, Cenelac), "the R2 Standard is the only one . . . that does not forbid the export of e-waste to developing countries" or "contain any reference to the Basel Convention").) The Report suggests that, of these standards, e-Stewards is comparatively "stricter with respect to exports, occupational safety and health, and downstream due diligence" and is "the only North American standard that audits and rewards companies for upholding the Basel Convention and the Ban Amendment." (Id. at 20, 51.) However, the Report also suggests that R2—which is apparently a competing standard—be amended to include compliance with the Basel Convention and the Ban Amendment. (Id. at 51.) Similarly, the Report recommends that corporations and governments use some form of GPS tracking to enforce the Basel Convention, but does not suggest that EarthEye is the only solution. (Id. ("Canadian authorities, police, and prosecutors must enforce the Basel Convention's export rules possibly with port inspections and by utilizing GPS trackers placed into wastes. . . . Corporations and governments generating large amounts of electronic waste are encouraged to use GPS tracking (see www.eartheye.org) to ensure downstream vendors abide by international law."). Considering the Report as a whole, the overall impression left by these statements is not that readers should use any specific product or service, but rather that the e-waste industry is rife with violations of the Basel Convention, and e-Stewards and EarthEye are but one means of encouraging compliance.

The third factor is the only one weighing in favor a finding of commercial speech. BAN does not dispute that it stands to benefit economically should corporations and governments implement its products and services. However, "economic motive in itself is insufficient to characterize a publication as commercial . . ." Dex Media, 696 F.3d at 960 (citations omitted);

Bolger, 463 U.S. at 67 ("[A]n economic motivation . . . would clearly be insufficient by itself to turn the materials [in question] into commercial speech.").

Finally, considering the commonsense distinction between commercial and noncommercial speech, the Court concludes that the Report fits within the latter category. Having concluded that the Report does not satisfy the Bolger factors, the Court need not reach the question of whether its commercial and noncommercial portions are inextricably intertwined, or whether ERA and BAN are in commercial competition. See Dex Media, 696 F.3d at 960-61.

The Court GRANTS the Motion to Dismiss with respect to the tortious interference claim.

**B. Attorneys' Fees**

BAN requests that, should the Court dismiss ERA's Lanham Act claim, it be awarded attorneys' fees and costs. (Dkt. No. 13 at 12-13.) "Section 35 of the Lanham Act permits an award of attorney's fees to a 'prevailing party' in 'exceptional cases.'" TrafficSchool.com, Inc. v. Edriver, Inc., 653 F.3d 820, 831-32 (9th Cir. 2011). "An exceptional case is found where 'a plaintiff's case is groundless, unreasonable, vexatious, or pursued in bad faith.'" Halicki Films, LLC v. Sanderson Sales and Marketing, 547 F.3d 1213, 1231 (9th Cir. 2008). At this stage, the Court finds that attorneys' fees are not warranted. Whether the Report constitutes commercial speech is somewhat of a close question, and ERA's false advertising claim is not groundless or unreasonable as a matter of law. Should it later be revealed that ERA pursued the claim in bad faith, the Court may take the issue up at that time.

**Conclusion**

For the foregoing reasons, the Court ORDERS as follows:

(1) The Motion to Dismiss is DENIED with respect to the defamation claim, with the exception that the statements in BAN's Report concerning the legality of ERA's conduct are nondefamatory as a matter of law;

(2) The Motion to Dismiss is DENIED with respect to the tortious interference claim;

(3) The Motion to Dismiss is GRANTED with respect to the false advertising claim; and

(4) BAN's request for attorneys fees is DENIED.

(5) The parties are advised that all future pleadings filed in this matter must comply with the formatting requirements for civil motions set forth in the Court's Chambers Procedures, *available at* http://www.wawd.uscourts.gov/sites/wawd/files/PechmanMotions.pdf. In particular, "[s]ubstantive information and discussion must appear in the body of the brief; footnotes are to be reserved for explanatory and supplemental information." Any use of footnotes that the Court deems an attempt to evade page limits will result in rejection of the pleading and an order to resubmit in the proper format.

The clerk is ordered to provide copies of this order to all counsel.

Dated April 2, 2019.

Marsha J. Pechman
United States District Judge